UNITED STATES of America

v.

Breane Nicole ROSE.

No. 4:01–CR–132–E.

United States District Court,
N.D. Texas,
Fort Worth Division.

Nov. 8, 2001.

J. Michael Worley, Fort Worth, TX, for plaintiff.

Christopher A. Curtis, Fort Worth, TX, for defendant.

### AMENDED MEMORANDUM OPINION AND ORDER

MCBRYDE, District Judge.

This amended memorandum opinion and order replaces in its entirety the memorandum opinion and order the court signed in the above-captioned case on November 7, 2001.

After having considered the Presentence Report pertaining to defendant, BREANE NICOLE ROSE ("Rose"), items related to the Presentence Report, and the information gained by the court during the telephone conference between counsel and the court on November 5, 2001, the court has concluded that the plea agreement between the government and Rose, signed and filed August 23, 2001, should be rejected for the reasons related below.

### I.

#### The Plea Agreement and Plea Proceedings

The plea agreement contemplates that Rose would plead guilty to the count of an

Information, which was filed July 12, 2001, charging that on or about September 22, 2000, Rose violated the misprision of a felony statute, 18 U.S.C. § 4, in the following respects:

> ... Rose, with knowledge of the actual commission of a felony offense against the United States, that is, that Frank Nunez had conspired with other persons to distribute and to possess with intent to distribute methamphetamine, a Schedule II, Controlled Substance, did knowingly and intentionally conceal and fail to disclose the same to any person in authority, under the United States.

Also, the plea agreement provides that Rose "will not be further prosecuted for her participation in the offenses alleged in the Information and as set forth in the Factual Resume." Plea Agreement at 3. The stipulation of facts contained in the Factual Résumé reads as follows:

> On July 12, 2000, Drug Enforcement Administration Task force [sic] Officer Tim Pickney [sic] received information concerning a known methamphetamine trafficker, Frank Nunez. During the course of my [sic] investigation involving Frank Nunez, while acting in an under cover capacity, TFO Pinckney purchased methamphetamine from Frank Nunez on three separate occasions.
>
> On September 22, 2000, TFO Pinckney obtained a Federal arrest warrant # 4:00–229–M for Frank Nunez and a Federal search warrant # 4–00–228–M for Frank Nunez [sic] residence located at 1218 Enclave Way Apartment # 904 in Arlington, Texas.
>
> On September 22, 2000, TFO Pinckney, along with members of the HIDTA DEA Task Force, executed the Federal search warrant at Frank Nunez's apartment. The defendant **BREANE NICOLE ROSE** was present at the apartment and was arrested by officers at the time of the search. Although **BRE-ANE NICOLE ROSE** had actual knowledge that Frank Nunez had conspired with other persons to possess and distribute methamphetamine at that location, she concealed that information and failed to notify any authority of Nunez's commission of that offense. During the search of the location, Agents/Officers located amphetamine and d-methamphetamine. Agents/Officers also located hand written ledgers/dope notes showing numerous different names and amounts, consistent with the methamphetamine distribution Frank Nunez was involved in. One of the many names/abbreviations on the dope notes was "Bre", which corresponds to **BREANE NICOLE ROSE.** "Bre" also corresponds to **BREANE NICOLE ROSE**'s name documented throughout Frank Nunez's phone list and documents. In one part of the dope notes ("Bre") Breane Rose shows to have distributed $45,100 dollars of methamphetamine/amphetamine. One of the other many "dope notes" with Breane Rose's name is a note written by Breane Rose and signed by Breane Rose, referring to narcotics being bought by her. The defendant **BRE-ANE NICOLE ROSE** concealed the offense by falsely telling officers that she was present in the apartment only to clean it. The defendant **BREANE NI-COLE ROSE** concealed her knowledge of Frank Nunez's conspiracy to Distribute, and to Possess with Intent to Distribute Methamphetamine, a Schedule II, Controlled Substance, as alleged in the Information, from the task force officers.

Factual Résumé at 2–3.

Thus, the immunity from further prosecution contemplated by the plea agreement would immunize Rose from prosecution from any and all drug offenses related to Rose's distribution of methamphetamine or

amphetamine through Frank Nunez ("Nunez") or growing out of Nunez's conspiracy to distribute and to possess with intent to distribute methamphetamine, including any participation Rose had in such a conspiracy.

As contemplated by the plea agreement, Rose pleaded guilty to misprision of a felony at a hearing held by the court on August 23, 2001. The court deferred acceptance of the plea agreement, ordered a Presentence Report, and scheduled the sentencing for November 8, 2001.

## II.

### *Offense Facts Disclosed by the Presentence Report*

The Presentence Report discloses that Rose was present in her sleep clothing at the apartment of Nunez when drug enforcement officers executed a warrant for the search of the apartment on September 22, 2000. Two other persons were present in the apartment when the officers entered, another female and a man by the name of Miguel Vilchis–Remigio ("Vilchis–Remigio"). The search resulted in the discovery and recovery of the. following items:

20. During the search of the apartment, task force officers seized 157.9 net grams of amphetamine with a purity of 33 percent and 389.0 net grams of d-methamphetamine from vacuumed sealed packages located on top of the medicine cabinet in the apartment bathroom, in plain view. The d-methamphetamine had a purity of 34 percent. Furthermore, $9,400 in U.S. currency, scales, packaging equipment, phone lists, ledgers/"dope" notes, and other drug paraphernalia were found in the apartment. Task force officers also found 3.42 net grams of amphetamine, in a clear plastic ziplock bag, female clothing, and a picture of **Rose** inside a backpack belonging to **Rose**. Laboratory analysis of the amphetamine and d-methamphetamine confirmed the substances and their net weight.

21. The ledgers/"dope" notes revealed numerous names and amounts consistent with the methamphetamine distribution Nunez was involved in. One of the many names/abbreviations on the "dope" notes was "Bre" which referred to **Rose**. "Bre" was documented throughout Nunez's "dope" notes. The "dope" notes indicated Vilchis–Remigio was Nunez' supplier of methamphetamine and that Rose was one of Nunez' customers. As reflected in the Factual Résumé, one part of the "dope" notes revealed **Rose** (Bre) was found to have distributed $45,100 worth of methamphetamine. On another "dope" note with **Rose's** name was a note written and signed by **Rose**. This note referred to narcotics being brought from Nunez by **Rose**.

Presentence Report at 5–6.

Rose was arrested on September 22, 2000, by state authorities on a state charge of possession of a controlled substance under two ounces, but was released in late November 2000 after the state charge was no-billed. In May 2001, the state law enforcement authorities presented a federal criminal complaint against Rose, following which she was again arrested. At the time of this arrest, Rose had a hypodermic syringe down the front area of her shirt. When she was interviewed by the state authorities on May 10, 2001, she made the following disclosures:

27. **Rose** informed TFO Pinckney and Officer Lopez that she met Nunez in the summer of 2000 and had

known him for approximately nine months prior to her arrest at Nunez's apartment on September 22, 2000. When **Rose** met Nunez, Nunez wanted her to immediately begin selling methamphetamine for him. Approximately one month later, **Rose** agreed to start distributing methamphetamine for Nunez. **Rose** informed TFO Pinckney and Officer Lopez that Nunez typically fronted her between one and two ounces of methamphetamine every two or three days at $750 an ounce. **Rose** then sold methamphetamine to dancers at Baby Dolls, a topless club located in Arlington, and she sold it to other people, as well.

28. During TFO Pinckney's and Officer Lopez' interview with **Rose,** TFO Pinckney presented copies of the "dope" notes seized containing **Rose's** name, which were collected from Nunez' apartment during the execution of the federal search warrant on September 22, 2000. **Rose** admitted that "Bre" was her name and the "dope" notes reflected the methamphetamine she was distributing for Nunez; however, the figures were dollar amounts that **Rose** owed Nunez for methamphetamine. **Rose** explained the figure shown in one of the columns under "Bre" indicated $45,100 was money owed to Nunez for methamphetamine that had been "fronted" to her. TFO Pinckney also presented **Rose** with a copy of the "dope" letter written and signed by **Rose.** **Rose** indicated that she wrote the letter to Nunez about methamphetamine she distributed and the money owed. **Rose** also told TFO

Pinckney that she stayed at Nunez' apartment every two to three days and corroborated information regarding two other individuals (Malibu Christy and Wanda Andrews) who also distributed methamphetamine for Nunez.

Presentence Report at 7.

The Presentence Report discloses that the true offense conduct of Rose was the commission by her on many occasions of the offenses of distribution of, and possession with intent to distribute, methamphetamine, in violation of 21 U.S.C. § 841(a)(1), and the commission by her of the offense of conspiracy to commit the offenses of distribution of, and possession with intent to distribute, methamphetamine, in violation of 21 U.S.C. § 846.

## III.

*Sentencing Options for the Misprision Offense Compared to the True Offense Conduct*

The maximum sentence Rose could be given by statute for a conviction of the misprision of a felony offense to which she pleaded guilty is three years. Assuming that Rose is given a three-level downward adjustment in her offense level based on acceptance of responsibility, the guideline imprisonment range for the sentencing of Rose based on a conviction of this offense is twenty-one to twenty-seven months. Even if the court were to upwardly depart because of Rose's true offense conduct, her sentence would be limited by statute to thirty-six months.

In sharp contrast, the sentencing alternatives that would exist if Rose were to be convicted of her true offense conduct would be several times greater than the sentencing options available for a mispri-

sion of a felony conviction. The statutory range of sentencing would be at least not less than ten years or more than life, 21 U.S.C. § 841(b)(1)(A), which would be the range based on a conviction of the conspiracy offense mentioned in the Information; and, other statutory sentencing potentials would exist in reference to Rose's conduct in the distribution of methamphetamine. Using information contained in the Presentence Report, Rose's guideline imprisonment range would be 87 to 108 months if she were to be convicted and sentenced for what appears to be her true offense conduct. This range assumes that Rose would receive a three-level downward adjustment in her offense level based on acceptance of responsibility and a two-level downward adjustment pursuant to the safety valve provision in the Sentencing Guidelines, USSG § 2D1.1(b)(6).

## IV.

*The Sentencing Scheme Contemplated by the Sentencing Guidelines and the Statute Pursuant to Which They Were Promulgated, 28 U.S.C. § 994(a)*

By the newly created sentencing scheme "Congress sought reasonable uniformity in sentencing by narrowing the wide disparity in sentences imposed for similar criminal offenses committed by similar offenders." United States Sentencing Commission, *Guidelines Manual*, at 2 (Nov.2000). The Guidelines were developed "as a practical effort toward the achievement of a more honest, uniform, equitable, proportional, and therefore effective sentencing system." *Id.* at 4.

Included in the Guidelines are policy statements relating to plea agreements, which have as a goal the prevention of "circumvention of the Sentencing Reform Act and the guidelines" by plea agreement practices of prosecutors. *Id.* at 7. More to the point here, the Sentencing Commission

provided the following explanation in the Sentencing Guidelines:

> *Policy statements governing the acceptance of plea agreements under Rule 11(e)(1), Fed.R.Crim.P., are intended to ensure that plea negotiation practices:*
>
> *(1) promote the statutory purposes of sentencing prescribed in 18 U.S.C. § 3553(a); and*
>
> *(2) do not perpetuate unwarranted sentencing disparity.*
>
> *These policy statements are a first step toward implementing 28 U.S.C. § 994(a)(2)(E). Congress indicated that it expects judges "to examine plea agreements to make certain that prosecutors have not used plea bargaining to undermine the sentencing guidelines." S.Rep. 98–225, 98th Cong., 1st Sess. 63, 167 (1983). In pursuit of this goal, the Commission shall study plea agreement practice under the guidelines and ultimately develop standards for judges to use in determining whether to accept plea agreements.*

*Id.* at 386. The standards that were adopted are contained in the Guidelines Manual as § 6B1.2, p.s., which reads, in pertinent part, as follows:

> (a) In the case of a plea agreement that includes the dismissal of any charges or an agreement not to pursue potential charges [Rule 11(e)(1)(A)], the court may accept the agreement if the court determines, for reasons stated on the record, that the remaining charges adequately reflect the seriousness of the actual offense behavior and that accepting the agreement will not undermine the statutory purposes of sentencing or the sentencing guidelines.

*Id.* at 387.

The statutory scheme contemplates that reductions in punishment ranges based on

a defendant's unique circumstance will be accomplished within the confines of the Guidelines. So that a defendant who has shown acceptance of responsibility for his or her offense conduct can be rewarded in the sentencing scheme for having done so, the Guidelines provide through USSG § 3E1.1 a reduction in the imprisonment range if the defendant clearly demonstrates acceptance of responsibility for his or her offense and possibly a further reduction depending on the promptness of the defendant in providing information to the government concerning his or her own involvement in the offense or timely notifying authorities of his or her intention to enter a plea of guilty. There are other provisions in the Guidelines that authorize the court to impose a sentence below the bottom of the guideline range if there are factors unique to the defendant that would make such a departure appropriate under the guideline provisions. *See* USSG §§ 5K1.1, 5K2.0, 5K2.10–5K2.13, 5K2.16, 5K2.19 & 5K2.20.

 In sum, the sentencing scheme contemplated by the Sentencing Guidelines and enabling statute is that the starting point for determining the sentence to be imposed is the sentencing range applicable to the defendant's true offense conduct and that from that point there will be adjustments in the punishment if there are unique facts in the case that would justify an adjustment or adjustments. The making, or acceptance, of a plea agreement that is at variance with the legally prescribed sentencing scheme should be avoided and rejected as inappropriate and, in effect, unlawful.

## V.

### *Reasons Given for the Misprision of a Felony Charging Decision*

Once the court realized the serious discrepancy between the range of sentencing that would exist if Rose were to be convicted of her true offense conduct and the range of sentencing that is available based on a misprision of a felony conviction, as the plea agreement contemplates, the court conducted a telephone conference with counsel on November 5, 2001, to the end of determining if there is a valid explanation for the unusual, and apparently unlawful, plea agreement. The explanation given by the assistant United States attorney responsible for prosecution of the case, J. Michael Worley, was as follows:

THE COURT:....

Can one of you tell me how this all came about?

MR. WORLEY: Basically, Your Honor, she was picked up after the prosecution of the other individuals. That's basically how it came about. Originally we were going to let her be prosecuted at the county. The county declined to prosecute her because—for whatever reason. They didn't like our search warrant. We do like our search warrant. At the original time we didn't know that she was one of the people named in the dope notes. When we later discovered that she was one of the people named in the dope notes, we decided she needed to be prosecuted.

THE COURT: Well, my question is: Why has she not been prosecuted for what the dope notes indicate she ought to be prosecuted for?

MR. WORLEY: That's why, Judge, is we got to her late, afterwards. Her attitude was that she was ready to change her life and ready to go to prison and then get out and do whatever, and we just made the determination that we would enter the agreement that we entered.

THE COURT: Well, is there any question about your ability to successfully prosecute her for the offense that's reflected by the dope notes?

MR. WORLEY: Your Honor, I don't know. I don't know that we would have any great difficulty doing that. We would have to bring in people form around the country that are serving time and that sort of thing. . . .

11/5/01 Tr. at 4–5. The explanation of counsel for Rose was as follows:

THE COURT: . . . .

Do you have any explanation for it, Mr. Curtis, different from his?

MR. CURTIS: Well, Your Honor, I don't know if I'm adding anything that he already mentioned, but I think initially there was a possibility that they would allow her to plead guilty down at the state, and I had hoped that I could convince Mr. Worley to do that. But based upon the factors I guess he's already mentioned, they felt like she needed to be prosecuted federally.

The other factor for you to look at, Judge, and I understand, Your Honor, that you're stuck with the guidelines and what they say you have to do, but she is—this is a unique individual who has really done everything she can do to try to—She is very young. She was 20 at the time she was arrested. She's done everything she could possibly to do to try to earn herself a second chance. I don't know how else to put it. . . .

*Id.* at 5–6. He added that "the other thing that comes to my mind . . . was the background that she comes from." *Id.* at 7.

## VI.

*The Plea Agreement and its Acceptance Violate the Established Sentencing Scheme*

 If the plea agreement were to be accepted by the court, it would cause Rose to be immune for prosecution for her true offense conduct. The misprision of a felony charge to which Rose pleaded guilty appears to be a contrivance utilized to avoid the lawfully established sentencing scheme. The undisputed facts contained in the Presentence Report show that Rose quite clearly was guilty of much more serious offenses for which she would avoid punishment under the plea agreement. The court cannot make the findings required by § 6B1.2, p.s. Indeed, the record supports findings exactly opposite from those contemplated by the Guidelines—the court finds that the remaining (misprision of a felony) charge does not adequately reflect the seriousness of the actual offense behavior of Rose, and the court finds that accepting the plea agreement will undermine the statutory purposes of sentencing and the Sentencing Guidelines. Not only would the range of punishment not be representative of Rose's true offense conduct, if Rose were to commit, and be convicted for, another drug offense in the future the sentencing scheme contemplated by 21 U.S.C. § 841(b) would be frustrated because Rose's conviction of the offense of misprision of a felony would mask and conceal the fact that her true offense conduct that led to the conviction were drug trafficking offenses. Acceptance of the plea agreement between the government and Rose would encourage unwarranted sentencing disparity. The court finds that in this case the prosecutor has used plea bargaining to undermine the Sentencing Guidelines.

While the court cannot force the office of the United States Attorney to prosecute Rose for her true offense conduct, the court can refrain from being implicated in the improper conduct of the prosecutor's office by declining to approve the plea agreement. Therefore,

The court ORDERS that the plea agreement between the government and Rose, which was signed and filed August 23, 2001, be, and is hereby, rejected by the court.

Rose and counsel appeared before the court at the time and date fixed for sentencing, November 8, 2001, at 10:00 a.m., when the court advised and admonished Rose, as contemplated by Federal Rule of Criminal Procedure 11(e)(4). Rose informed the court that she did not wish to withdraw her plea of guilty. When the court again made known that the court was considering an upward departure based on Rose's true offense conduct, Rose's counsel requested a continuance of the sentencing hearing so that he might file a memorandum on the issue of upward departure. Consistent with that request, the court is continuing the sentencing hearing and has given counsel for Rose until 2:00 p.m. on Tuesday, November 13, 2001, for the filing of a memorandum on the issue of upward departure.

The court further ORDERS that the sentencing hearing in this case be, and is hereby, continued to 10:00 a.m. on November 15, 2001, at which time and date Rose and counsel are to appear before the court for sentencing in the Fourth Floor Courtroom of the United States Courthouse, Fort Worth, Texas.